# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

LINDA UNRUH,

    Plaintiff,

v.                                                                                                   No. 17-cv-0422 JCH/SMV

JAMES D. VANDEVER TRUCKING, INC.
and EARL ROGER GARRETT,

    Defendants.

## MAGISTRATE JUDGE'S
## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before me on the parties' Third Joint Motion to Approve Minors' Settlements [Doc. 73], filed on March 29, 2018. The Honorable Judith C. Herrera, United States District Judge, referred this matter to me to conduct a fairness hearing and make a recommendation as to whether the settlement is in the best interests of the beneficiaries and whether it should be approved. [Doc. 20]. The Court-appointed *guardian ad litem*, Donald Schutte, submitted his Second Supplemental Report of *Guardian Ad Litem* on March 23, 2018 [Doc. 70],[1] recommending approval of the settlement agreement. I held a fairness hearing on March 27, 2018. I have considered the motion, the *guardian ad litem*'s report, the representations made during the fairness hearing, the record, and the relevant law. With one exception, I find the proposed settlement to be fair, reasonable, and in the minor children's best

---

[1] Mr. Schutte's Second Supplemental Report incorporated by reference his Report of *Guardian Ad Litem* [Doc. 29], filed on September 28, 2017, and Supplemental Report of *Guardian Ad Litem* [Doc. 42], filed on October 26, 2017. *See* [Doc. 70] at 1.

interests. I therefore recommend that the motion be DENIED and that the parties be permitted to submit an amended motion as set out more fully below.[2]

## Background

On February 19, 2017, Robert Unruh was hit by a tractor trailer along Interstate 40 outside of Tucumcari, New Mexico. [Doc. 1-1] at 3. He was killed on impact. *Id.* at 4. Mr. Unruh operated a towing company and had arrived to assist a disabled vehicle parked along the shoulder of the interstate. Mr. Unruh had gotten out of his vehicle and was directing traffic away from the outside lane of the interstate when he was struck and killed. *Id.*

Plaintiff Linda Unruh, the decedent's mother, was appointed personal representative of the decedent's wrongful death estate and next friend of the decedent's three minor children. *Id.* at 1. She retained attorney Michael Garrett. On March 10, 2017, Mr. Garrett filed a wrongful death action in state court against Earl Roger Garrett, the driver of the truck, and James D. Vandever Trucking Co., his employer. Pursuant to the New Mexico Wrongful Death Act, NMSA 1978, § 41-2-1, Plaintiff alleged that Defendants' negligence caused Robert Unruh's death and requested compensatory and punitive damages. Defendants denied liability.

Defendants removed the action to this Court on April 6, 2017. [Doc. 1]. On May 3, 2017, counsel for Defendants notified the undersigned's chambers that the parties had reached a settlement in the matter, and I directed the parties to file their closing documents. [Doc. 13]. The parties filed a joint motion to dismiss on June 1, 2017. [Doc. 14]. Subsequently, Judge Herrera ordered the parties to show cause why the proposed settlement should not be

---
[2] Also pending before me is the parties' second Joint Motion to Approve Minors' Settlements [Doc. 69], filed on March 23, 2018. I recommend that that motion be denied as moot because the parties subsequently filed their Third Joint Motion to Approve [Doc. 73].

2

subject to review by a *guardian ad litem* and a fairness hearing to determine whether the settlement was in the minors' best interest. [Doc. 18]. No party responded, and on June 26, 2017, Judge Herrera ordered that a *guardian ad litem* be appointed and that the parties file a motion to approve the settlement.[3] [Doc. 20]. Mr. Schutte was appointed as *guardian ad litem* on August 2, 2017, [Doc. 23], and the parties' Joint Motion to Approve Minor Settlement ("Motion to Approve") was filed on August 25, 2017. [Doc. 28].

The motion indicated that the parties had agreed to settle the case for $1,000,000, the limits of all available insurance coverage. *Id.* at 1. The settlement amount was reduced by Mr. Garrett's fee (33.33%), litigation costs, and other expenses. *Id.* at 4–5. The proposal called for a portion of the settlement funds to be distributed to two towing companies and one of their employees who purportedly "ha[d] claims arising from the incident." *Id.* at 1. The remainder was to be split evenly among Plaintiff and the three minors—i.e., one-fourth of the balance was to go to Plaintiff and one-fourth to each of the three minor children. *Id.* The minors' shares (together) totaled $412,536.18.

Mr. Schutte filed his first report on September 28, 2017. [Doc. 29]. Mr. Schutte found that it was likely reasonable to settle the case for the available insurance limits, i.e., $1,000,000, assuming Defendants lacked significant assets to satisfy a judgment above policy limits. *Id.* at 9. However, he had serious concerns about the proposed settlement agreement and distribution. Among other things, he questioned: (1) the distribution of an equal share of the settlement proceeds to Plaintiff, individually; (2) certain expenses claimed by Plaintiff and Mr. Garrett

---

[3] By this time, Plaintiff's then-counsel, Michael Garrett, had received the settlement funds from Defendants' insurer and had made disbursements. *See* [Doc. 29] at 4; [Doc. 31] at 2.

which appeared unnecessary or too high; (3) the amount of attorney's fees claimed by Mr. Garrett; and (4) the lack of a structured settlement for the minors. *Id.* at 4–9. Given these concerns, he found that the proposed apportionment was not fair to the minors. *Id.* at 9–10. He also noted that the settlement proceeds had already been received by Plaintiff's counsel, which he noted "may seriously limit or rule out possible available options for structuring future benefits for the children." *Id.* at 4. Plaintiff responded to the *guardian ad litem*'s report, maintaining that approval of the settlement was warranted. [Doc. 31].

I scheduled a fairness hearing on October 30, 2017, and ordered the parties to deposit the full amount of the settlement proceeds in the Court registry.[4] [Doc. 34]. By the time of the fairness hearing, Plaintiff had discharged Mr. Garrett and hired Brian Grayson. [Docs. 40, 46]. Mr. Garrett had also retained counsel. [Doc. 38]. Mr. Schutte had filed a supplemental report, in which he reasserted his concerns as to the proposed disbursements, expenses, and attorney's fees. [Doc. 42].

At the hearing, Mr. Grayson stated that Plaintiff did not believe the settlement was fair, and that she planned to withdraw her motion to approve. *See* [Doc. 48] at 2. Given the representations of Plaintiff's counsel and the reports from the *guardian ad litem*, I declined to proceed with the fairness hearing. Instead, with the parties' consent, I held a mediation at which we discussed a number of issues, including the proposed attorney's fees, disbursements to third

---

[4] The full settlement amount was deposited in the Court registry. *See* [Doc. 56]. The funds were subsequently disbursed to Defendants' insurance carrier in care of defense counsel. *See* [Doc. 59]; *see also infra* note 17 (explaining why the settlement proceeds needed to be returned to the insurance carrier). Interest in the amount of $2,149.43 accrued while the funds were in the Court registry.

parties, expenses to be reimbursed, and structured settlements for the children. Those mediation efforts continued over the next several months.

At a status conference on March 9, 2018, counsel stated that they had reached an agreement and were prepared to proceed with a fairness hearing. *See* [Doc. 67]. On March 23, 2018, the parties filed their second Joint Motion to Approve Minors' Settlement [Doc. 69]. The same day, Mr. Schutte filed a second supplemental report. [Doc. 70]. As to the settlement amount, Mr. Schutte was satisfied that it constituted the total amount of available insurance coverage, and that attempting to obtain an excess judgment against Defendants "would not be particularly productive in a timely fashion." *Id.* at 1–2. He further found that the revised disbursement schedule addressed the matters to which he had objected in his prior reports. *Id.* at 2. Mr. Garrett had agreed to reduce his fee from 33.33% to 27.5%. Mr. Schutte noted that while he would have liked to see the fee percentage reduced even further, he agreed not to oppose the proposed fee in the interest of getting the settlement funds disbursed for the benefit of the minors. He further found that the proposed structured settlement plan was reasonable. *Id.* at 3–4.

I held a fairness hearing on March 27, 2018. Mr. Grayson presented the parties' updated settlement proposal. He pointed out that no settlement funds would go to the towing companies, their employee, or Plaintiff individually. He noted other expenses that would no longer be reimbursed from the settlement funds. He also stated that Plaintiff had agreed to waive certain expenses that she had claimed in the second Joint Motion to Approve. He described the conservatorship that had been set up for two of the minor children and the structured settlements

that were proposed for all three. He noted that the three structured settlements would pay out more than $1,000,000 over the life of the plan. He argued for the reasonableness of fees and expenses that would be reimbursed from the settlement. I also heard from Defendants' counsel, Mr. Garrett's counsel, the *guardian ad litem*, and Plaintiff. Ultimately, all parties believed that the settlement was fair and reasonable and recommended that it be approved by the Court. We discussed the fact that the settlement proceeds had earned a small amount of interest while deposited in the Court registry. Everyone agreed that the interest should go to the children. I asked Mr. Grayson to file an amended motion reflecting the final figures discussed at the fairness hearing. He filed the parties' Third Joint Motion to Approve Minors' Settlement ("Third Motion to Approve"), on March 29, 2018. [Doc. 73].

The following table shows the proposed distribution of settlement funds, accounting for attorney's fees, expenses to be reimbursed to Plaintiff and Mr. Garrett, and other disbursements. It compares the initial proposed distribution scheme against the final proposal. The final settlement proposal would result in a balance of $623,647.81. Adding the interest that accrued while the settlement funds were in the Court registry, the total balance to the three minor children comes to $625,797.24.

| Costs and Expenses | Initial Settlement | Final Settlement |
|---|---|---|
| **Items Eliminated from Original Settlement Proposal** | | |
| Payment to Plaintiff | $137,512.06 | $0.00 |
| Payment to Chad Becerra | $5,000.00 | $0.00 |
| Payment to Pinky's Towing | $2,500.00 | $0.00 |
| Payment to Allrite Towing | $2,500.00 | $0.00 |
| Probate Costs | $5,405.00 | $0.00 |
| *Guardian Ad Litem* Fee | $325.13 | $0.00 |
| Funeral Expenses | $12,193.09 | $0.00 |
| **Costs to be Reimbursed to Mr. Garrett** | | |
| Workers' Compensation Subrogation Claim | $30,000.00 | $30,000.00 |
| Network and Security Solutions | $6,486.00 | $6,000.00 |
| Other Litigation Costs | $0.00 | $1,833.50 |
| **Costs to be Reimbursed to Plaintiff** | | |
| Conservatorship | $5,405.00 | $5,405.00 |
| M. Brian McDonald | $1,901.50 | $1,901.50 |
| J.G. Vick Consulting | $17,341.85 | $17,341.85 |
| Clements Special Investigations | $1,361.58 | $5,389.62 |
| Crash Analysis ("black box" data download) | $2,802.59 | $2,802.59 |
| **Attorney's Fees** | | |
| Mr. Grayson's Fee and gross receipts tax ("GRT") | $0.00 | $8,062.50 |
| Mr. Garrett's Fee and GRT | $356,730.00 | $297,515.63 |
| **Other Costs** | | |
| Mr. Grayson's Litigation Costs | $0.00 | $100.00 |
| **Total Deductions** | **$587,463.80** | **$376,352.19** |
| **Balance to Minors (Interest Added)** | **$412,536.18** | **$625,797.24** |

## Legal Standard

"The general rule [in many jurisdictions] is that a next friend or *guardian ad litem* acting for a minor may negotiate a settlement, but such compromise is not binding on the infant in the absence of judicial approval." *Garcia v. Middle Rio Grande Conservancy Dist.*, 1983-NMCA-047, ¶ 28, 99 N.M. 802, *overruled on other grounds by Montoya v. AKAL Sec.,*

*Inc.*, 1992-NMSC-056, 114 N.M. 354. Though New Mexico has not adopted this rule, under its common law, the Court "has a special obligation to see that [children] are properly represented, not only by their own representatives, but also by the court itself." *Id.* ¶ 30; *see also Garrick v. Weaver*, 888 F.2d 687, 693 (10th Cir. 1989) (Courts have a "general duty . . . to protect the interests of [minors and incompetent persons] in cases before the court."). Thus, when a settlement is presented to a reviewing court for approval, the court must determine whether the settlement is fair and the best interests of the minor children. *See Shelton v. Sloan*, 1999-NMCA-048, ¶ 41, 127 N.M. 92 (concluding that the Court's role is to "review[ ] the fairness of the agreement itself"); *Garcia*, 1983-NMCA-047, ¶ 30 ("In passing upon settlements dealing with claims or rights of minors, the court must determine whether the approval of a compromise would be in the best interests and welfare of the minor child."). "[W]hen a settlement involving a minor is presented to a court for approval and the information before the court indicates that the settlement is not fair to the minor, the court must reject the settlement." *Shelton*, 1999-NMCA-048, ¶ 42.

## Analysis

In reviewing the fairness of the settlement presently before me, I have been guided by the following factors:

> (1) whether the settlement terms were fairly and honestly negotiated; (2) whether serious questions of law or fact exist, placing the ultimate outcome of litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of a greater future recovery after protracted and expensive litigation; and (4) whether the settlement is fair and reasonable in its effect.

*Ball v. DATS Trucking, Inc.*, No. 11-cv-0094 JB/WPL, [Doc. 61] at 4 (D.N.M. Dec. 11, 2012) (citing *Jones v. Nuclear Pharm., Inc.*, 741 F.2d 322, 324 (10th Cir. 1984)). I find that, with one exception, the proposed distribution is fair, reasonable, and in the minors' best interests.

1. **<u>The proposed settlement was fairly and honestly negotiated.</u>**

There are two aspects to this factor: the negotiations between Mr. Garrett and Defendants, and the negotiations between Mr. Garrett and Plaintiff's new counsel, Mr. Grayson. As to the former, there is no indication those negotiations were anything other than above board. The insurance carrier for Defendants tendered its full policy limits less than 90 days after the accident. Mr. Garrett investigated Defendants' assets to determine whether there was any likelihood of collecting on a judgment in excess of policy limits. He learned that while Defendant Vandever Trucking owned a number of expensive vehicles, all were heavily encumbered. *See* [Doc. 42] at 16–29; [Doc. 57-3] ("Vandever Trucking Company, Inc.– Summary of Assets, Liens and Values"). He therefore properly accepted Defendants' policy-limits offer.

The subsequent negotiations between Mr. Garrett and Mr. Grayson primarily involved litigation costs and Mr. Garrett's fees. Mr. Grayson had asked Mr. Garrett to provide documentation to support certain costs. Mr. Garrett provided the requested information. Mr. Grayson and the *guardian ad litem* are satisfied that the costs reflected in the Third Motion to Approve are appropriate. Based on my conversations with the *guardian ad litem* and the evidence presented at the fairness hearing, I concur. Mr. Garrett agreed to reduce his fees from 33.3% to 27.5%. Plaintiff and the *guardian ad litem* agree that this fee is reasonable, although

both have expressed some reservations. *See* [Doc. 70] at 2. While I disagree as to the reasonableness of Mr. Garrett's fees, which I will discuss in more detail below, I conclude that the terms of the final proposed settlement were fairly and honestly negotiated.

    **2. <u>Serious questions of fact exist, which place the ultimate outcome of the litigation in doubt.</u>**

Plaintiff settled for the limits of all available insurance coverage. Thus, this factor is not as significant as it might be in the typical compromise settlement. As a practical matter, Plaintiff is receiving in the settlement all she could reasonably expect to recover at trial. That being said, there are serious questions of fact that place the ultimate outcome of the litigation in doubt. The New Mexico State Police investigated the accident. *See* [Doc. 45-2] (State of New Mexico Uniform Crash Report) (hereinafter "Accident Report"). The investigating officer took photographs of the scene, obtained statements from several witnesses, and prepared a detailed, 24-page Accident Report. *Id*. The Accident Report places all the blame on the decedent, *id*. at 4 (Mr. Unruh "walked into roadway"), and none on the Defendant driver, *id*. at 3 ("Veh. No. 1–No Driver Error"). Additionally, the physical evidence at the scene clearly established that the point of impact occurred in the traveled lane of the highway, not on the shoulder. *See id*. at 6, 14 (skid marks from decedent's shoes clearly in lane of travel). This evidence was consistent with the Defendant driver's statement. *Id*. at 12 ("As I came up on the trailer I saw a person step out into the highway."). Thus, at the very least, there were significant issues of comparative fault as between Mr. Unruh and the Defendant driver. Plaintiff might have recovered less at trial than she is to receive in the settlement, or nothing at all, depending on the amount of comparative negligence attributed to Mr. Unruh.

### 3. The value of an immediate recovery outweighs the possibility of future relief.

Again, this factor is of less significance, given that the settlement is for full policy limits. Assuming Plaintiff is receiving in the settlement all she could hope to recover at trial, it would make no sense to delay that recovery. Protracted and expensive litigation would only reduce the children's eventual recovery. And as just discussed, the outcome of a trial would by no means be a foregone conclusion.

### 4. With one exception, the settlement is fair and reasonable in its effect.

I begin this part of the analysis by reviewing the items that were included in the original proposed settlement but excluded from the final proposed settlement. The elimination of these items alone increases the children's share of the settlement by more than $165,000. I then review the costs to be reimbursed to Mr. Garrett; the costs to be reimbursed to Plaintiff; Mr. Grayson's attorney's fees; Mr. Garrett's attorney's fees; and the structured settlements to be purchased from the children's portion of the settlement. With one exception—Mr. Garrett's fees—I find that the proposed settlement is fair and reasonable in its effect.

#### A. Items Eliminated from the Original Settlement Proposal

The Third Motion to Approve excludes several disbursements that were improperly included in the original Motion to Approve. These disbursements include a payment to Plaintiff in her individual capacity ($137,512.06); a payment to Chad Becerra, a witness to the accident ($5,000); a payment to Pinky's Towing ($2,500); a payment to Allrite Towing ($2,500); the cost of probating Mr. Unruh's estate ($5,405); and a portion of the *guardian ad litem*'s fees ($325.13). Additionally, Plaintiff has agreed to pay the remainder of Mr. Unruh's funeral

expenses not already covered by his insurance provider ($4,986.15).[5] All these deductions inure to the children's benefit.

### B. Costs to be Reimbursed to Mr. Garrett

Mr. Garrett is to be reimbursed for $37,833.50 in costs. [Doc. 73] at 3. The bulk of this amount ($30,000) is to satisfy a workers' compensation subrogation claim,[6] which is not in dispute. *See* [Doc. 57-1] at 4–7. Of the remaining $7,833.50, $6,000 is for the downloading of cellphone data. *See id.* at 9 (Invoice from Network and Security Solutions, LLC). These costs were incurred because defense counsel had requested the preservation of certain evidence related to the accident, including cell phone data. *See id.* at 11–12 (February 23, 2017 letter from defense counsel to Plaintiff's counsel). The remaining $1,833.50 represents typical litigation costs, e.g., travel expenses to inspect the vehicle involved in the accident, filing fee, jury demand fee, and process server. *See* [Doc. 73] at 3. I find these expenses to be reasonable under the circumstances.

### C. Costs to be Reimbursed to Plaintiff

Ms. Unruh personally advanced most of the litigation costs. Under the proposed distribution, she is to be reimbursed $32,840.56. *Id.* at 4. The cost of establishing a conservatorship for the minor children ($5,405) appears to be reasonable, and the *guardian ad litem* confirms that it is in the children's best interests. Plaintiff advanced the cost of hiring Brian McDonald, an economist, to prepare a report on economic and hedonic damages.

---

[5] The funeral expenses totaled $12,193.09. *See* [Doc. 28] at 4. A portion of those expenses were apparently covered by Mr. Unruh's insurance, leaving a balance of $4,986.15.
[6] The actual subrogation claim was in excess of $250,000. [Doc. 57]. Mr. Garrett negotiated it down to $30,000. *Id*. He took no fees for handling the workers' compensation claim. *Id*.

*See* Ex. 2 to [Doc. 31]. I find that expense ($1,901.50) to be reasonable. The remaining costs were for hiring two investigators, J.G. Vick Consulting and Clements Special Investigation, and for downloading the "black box" data from the Defendant driver's truck. [Doc. 73] at 4. The total ($25,534.06) seems somewhat high. But given the amount of money at stake, I will not second-guess Mr. Garrett's decision to investigate the accident aggressively. My decision in this regard is informed by my conversations with Mr. Grayson, who was no less aggressive in scrutinizing Mr. Garrett's bills. Mr. Grayson knows J.G. Vick professionally[7] and is satisfied that his bills in this case are reasonable, if "somewhat on the high side." I therefore conclude that these expenses were necessary and reasonable under the circumstances.

### D. Mr. Grayson's Fees

Mr. Grayson is to be paid $8,062.50, including NM GRT. [Doc. 73] at 3. The *guardian ad litem* characterized these fees as "minimal." [Doc. 70] at 2. I agree. I suspect this amount reflects but a fraction of the time Mr. Grayson has spent on this matter. The fees are exceptionally reasonable under the circumstances.

### E. Mr. Garrett's Fees

Mr. Garrett took the case on a contingency fee basis. The engagement contract called for a contingency fee of "33.3% plus applicable sales tax and gross receipts tax of any and all settlement recovery from the gross settlement."[8] [Doc. 57-2] at 2. Thus, the original Motion to

---

[7] I do not know Mr. Vick personally, but I am aware that he has a good reputation among members of the bar. I have no reason to question his professionalism or billing practices.

[8] Such contingency fee agreements are customary in wrongful death actions. However, they are still subject to Rule 16-105(A) NMRA, which provides, "A lawyer shall not make an agreement for, charge, or collect an unreasonable fee. The Committee Commentary [3] to Rule 16-105 states, "Contingency fees, like any other fees, are subject to the reasonableness standard of Paragraph A of this rule."

Approve called for fees and GRT totaling $365,730. [Doc. 28] at 4. The *guardian ad litem* objected to this amount, [Doc. 29] at 5-8 and [Doc. 42], as did Plaintiff. The Third Motion to Approve reduces Mr. Garrett's fees to 27.5% of the settlement amount plus GRT, for a total of $297,515.63. [Doc. 73] at 3.

This is the matter that has caused me the greatest concern. There are a number of factors that militate in favor of approving the fees:

- Mr. Garrett is a highly experienced personal injury litigator.[9]

- He took on a case that, at first appearances, seemed pretty weak.

- He aggressively and competently worked the case and obtained a $1,000,000 policy limits settlement in under 10 weeks.

- He did a thorough investigation to make sure Defendants were judgment-proof before accepting the insurance policy limits.

- He filed a workers' compensation claim on behalf of the children and took no fees for doing so.[10] He subsequently resolved the workers' compensation subrogation claim very favorably for the children.[11]

- The parties agreed to the 27.5% contingency fee after intense and extended negotiations.

---

[9] *See* [Doc. 45-3] at 2 (more than 50 years' experience representing plaintiffs in personal injury and wrongful death actions).

[10] He could have asked for a fee of up to $22,500 for representing the estate with respect to the workers' compensation claim. *See* NMSA 1978, § 52-1-54(I).

[11] The workers' compensation carrier, New Mexico Mutual, is paying monthly death benefits to the three children. *See* [Doc. 29] at 2–3. The carrier would have had a subrogation claim against any settlement in the wrongful death action. Mr. Garrett negotiated that claim, estimated to be approximately $250,000, down to $30,000. *See* [Doc.] 57 at 2.

- Three attorneys whose opinions I respect (Mr. Grayson, Mr. Hamilton, and Mr. Schutte) have told me that they believe the fees are reasonable.[12]
- Plaintiff believes the current settlement is fair and reasonable and has asked that it be approved.

All those factors weigh in favor of approving Mr. Garrett's fees. And yet, there is no getting around the fact that Mr. Garrett made a number of shockingly bad decisions that, at best, kept the children from receiving the benefits of the settlement for nearly a year. These include:

- distributing 25% of the net settlement proceeds to Plaintiff for her purported loss of parental consortium claim;[13]
- distributing portions of the settlement proceeds to individuals and entities who were not parties to the lawsuit (Chad Becerra, Pinky's Towing, Allrite Towing, and Plaintiff in her individual capacity);[14]
- distributing the settlement proceeds before obtaining Court approval of the settlement;[15] and,

---

[12] Although Defendants join in the Third Motion to Approve, they take no position on the distribution of the settlement proceeds, including Mr. Garrett's fees. *See* [Doc. 73] at 2.

[13] As the *guardian litem* pointed out, it is questionable whether Plaintiff even has a loss-of-consortium claim. *See* [Doc. 29] at 4 n. 1; *Silva v. Lovelace Health Sys., Inc.*, 2014-NMCA-086, ¶ 42, 331 P.3d 958 (discussing degree of mutual dependence necessary to support a claim for loss of parental consortium). But even assuming she has such a claim, it is difficult to see how Mr. Garrett could represent her and the statutory beneficiaries of Mr. Unruh's estate (his three minor children) without creating a conflict of interests. *See* Rule 16-107 NMRA (conflict of interest exists where "the representation of one client will be directly adverse to another client" or "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client[,] or a third person"). It would seem that any attorney representing the estate would have an ethical obligation to try to defeat Plaintiff's loss-of-consortium claim.

[14] I assume these payments were made because the insurance carrier wanted releases from these individuals and entities in order to extinguish all potential claims in exchange for its policy limits. *See* [Doc. 57] at 3. That makes sense, but it was not Mr. Garrett's call to make. He represented the estate, and only the estate. It was inappropriate for him to bring a lawsuit on behalf of one party, settle the case on behalf of that party, and then distribute portions of the settlement proceeds to third parties.

- accepting the settlement proceeds before purchasing structured settlement annuities for the minor children.[16]

Additionally, although Mr. Garrett cannot be accused of sitting on his hands, the case was settled very quickly with relatively little work.[17] Mr. Garrett clams to have spent 186.6 hours on the case. [Doc. 54-3] at 12. A fee of $275,000 (27.5%) would yield an hourly rate of $1,473.74, which would not pass muster under a "lodestar" analysis.[18] *See also* Rule 16-105(A) ("A lawyer shall not make an agreement for, charge or collect an unreasonable fee . . . .").

I am aware, of course, that contingency fee arrangements are common in wrongful death actions, and that such arrangements typically generate fees much greater than those based on an hourly rate. *See, e.g.*, *Hensley*, 461 U.S. at 448–49 (1983) (Brennan, J., concurring in part and dissenting in part); *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 598 (10th Cir. 1990). A 33.3% contingency fee is fairly common and not per se unreasonable or unconscionable.

---

[15] Although Mr. Garrett claims the plan was to seek approval of the settlement from the state district judge who probated the estate, [Doc. 31] at 2, that does not explain his decision to distribute the settlement proceeds before obtaining court approval.

[16] This is significant because in order to avoid paying taxes on a structured settlement annuity, the funds used to purchase the annuity must go straight from the defense to the insurance company issuing the annuity. *See* 26 U.S.C. § 104(a), 130(c). The funds used to purchase the annuity cannot pass through an attorney's trust account. *See* Ex. B to [Doc. 29] at 15–16 (Email dated June 8, 2017, from Sara VanFleet, VFS Structured Settlements, to Mr. Garrett). This is why the $1,000,000 settlement proceeds in this case had to be returned to Defendants' insurance carrier before a structured settlement could be achieved.

[17] The accident occurred on February 19, 2017. [Doc. 1-1] at 1. The Complaint was filed on March 10, 2017. *Id.* Mr. Garrett served interrogatories and requests for production with the Complaint. [Doc. 29] at 6. Defendants never answered that discovery, and no other formal discovery was undertaken. *Id.* The settlement check was issued on May 11, 2017. [Doc. 57-1] at 3.

[18] "To determine the reasonableness of a fee request, a court must begin by calculating the so-called 'lodestar amount' of a fee, and a claimant is entitled to the presumption that this lodestar amount reflects a 'reasonable' fee." *Robinson v. City of Edmond*, 160 F.3d 1275, 1281 (10th Cir. 1998). The lodestar is "'the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate,' which produces a presumptively reasonable fee that may in rare circumstances be adjusted to account for the presence of special circumstances." *Anchondo v. Anderson, Crenshaw & Assoc., LLC*, 616 F.3d 1098, 1102 (10th Cir. 2010) (quoting *Hensley v. Ekerhart*, 461 U.S. 424, 433 (1983), and *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 543–44 (2010)).

*Citizens Bank v. C&H Constr. & Paving Co.*, 1979-NMCA-106, ¶ 39, 93 N.M. 422. The Court should not rewrite contracts entered into by parties negotiating at arm's length. *E.g.*, *Nearburg v. Yates Petroleum Corp.*, 1997-NMCA-069, ¶ 31, 123 N.M. 526; *Lozano v. GTE Lenkurt, Inc.*, 1996-NMCA-074, ¶ 27, 122 N.M. 103 ("Generally, courts should enforce contingency fee contracts as made."). But the overriding concern here is not freedom of contract, but protection of the minors. A court is required to reject a settlement "[w]hen a settlement involving a minor is presented to a court for approval and the information before the court indicates that the settlement is not fair to the minor." *Shelton*, 1999-NMCA-048, ¶ 42. "The court's role in reviewing a settlement is to 'represent[ ]' the minor." *Id.* ¶ 45 (quoting *Bonds v. Joplin's Heirs*, 1958-NMSC-095, ¶ 9, 64 N.M. 342).

Considering all the factors mentioned above, and based on everything I have learned about this case over the past year, I believe the upper limit of reasonableness for Mr. Garrett's fee would be 25%, with the difference (2.5%) going to the children, either through the structured settlements or the conservatorship. I would recommend approval of the settlement if that change were made.

### F. The Structured Settlements

I begin by noting that the children are already receiving Social Security and workers' compensation benefits as a result of their father's death. Destiny is 15 years old. She receives $1,100 per month from Social Security and $222 bi-weekly in workers' compensation benefits. [Doc. 29] at 2. Robert is 10 years old. He receives $556 per month from Social Security and $222 bi-weekly in workers' compensation benefits. *Id*. at 3. Leland is eight years old. He

receives $730 per month from Social Security and $222 bi-weekly in workers' compensation benefits. *Id.* These benefits will continue until each child turns 18, or until 25 if he or she is in school. [Doc. 29] at 2–3.

Under the original Motion to Approve, the three minor children would have received $412,536.18 ($137,512.06 each). [Doc. 28] at 1. Under the Third Motion to Approve, they will receive $625,797.24 ($208,599.08 each).[19] [Doc. 73] at 3, 5–6. Most of that money will be used to purchase a structured settlement annuity for each child, the terms of which are set forth in the Motion. *Id.* at 2–3. The three structures, combined, will pay out more than $1,000,000 over the life of the plan. *Id.* at 4. The *guardian ad litem* approves the structured settlements. [Doc. 70] at 2–4. I find that they are reasonable and in the best interest of the children.

## Conclusion

In light of the foregoing, I make the following findings: (1) the proposed settlement was fairly and honestly negotiated; (2) serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and, with one exception, (4) the settlement is fair and reasonable in its effect. I do not believe Mr. Garrett's 27.5% contingency fee is reasonable. I would recommend approval of the Motion if Mr. Garrett's contingency fee were reduced to 25%, plus NM GRT, with the difference going to the children, through either the structured settlements or the conservatorship.

---

[19] This amount takes into account the interest the settlement proceeds earned while in the Court registry.

**IT IS THEREFORE RECOMMENDED** that the parties' Third Joint Motion to Approve Minors' Settlements [Doc. 73] be DENIED.  I recommend that the parties be allowed to submit an amended motion reducing Mr. Garrett attorney's fees from 27.5% to 25%, plus NM GRT, the difference going to the minor children, through either the structured settlements or the conservatorship.

**IT IS FURTHER RECOMMENDED** that the parties' second Joint Motion to Approve Minors' Settlements [Doc. 69] be DENIED as moot.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN FOURTEEN DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition, they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any written objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.**  *See* **D.N.M.LR-Civ. 10.1.  If no objections are filed, no appellate review will be allowed.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**