IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LINDA UNRUH as Personal Representative
of the Wrongful Death ESTATE OF
ROBERT L. UNRUH, JR., Deceased,
and as next friend on behalf of
Robert L. Unruh's minor children,
Destiny Unruh, Robert Lee Unruh
and Leland Merle Unruh,

        Plaintiff,

v.                                                  Civ. No. 17-422 JCH/SMV

JAMES D. VANDEVER TRUCKING, INC.,
and EARL ROGER GARRETT,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the question of whether the proposed settlement of the case is fair and in the best interests of the minors. The Court has reviewed the complete record in this case, though of particular relevance are the parties' *Fourth Joint Motion to Approve Minors' Settlements* [Doc. 78], filed on April 25, 2018, as well as the *Proposed Findings and Recommended Disposition* [Doc. 74] of United States Magistrate Judge Stephan M. Vidmar regarding the motion to approve, the objections thereto filed by The Garrett Law Firm, P.A. [Doc. 75], and the various *Reports of Guardian Ad Litem* [Docs. 29, 42, and 70].

On March 27, 2018, Judge Vidmar conducted a fairness hearing regarding the proposed settlement, which at that time was set forth in the Joint Motion to Approve Minors' Settlements [Doc. 69], and which set forth Mr. Garrett's fee at 27.5%, or $275,000.00, not including Gross

Receipts Tax. After the hearing, Judge Vidmar recommended that the Court approve the settlement, with the exception of the amount of attorney's fees awarded to The Garrett Law Firm. Judge Vidmar stated, "I believe the upper limit of reasonableness for Mr. Garrett's fee would be 25%." Doc. 74 at 17. Accordingly, the parties revised the amount of fees to be awarded to Mr. Garrett to 25% plus Gross Receipts Tax, and the parties' current motion to approve the settlement [Doc. 78] reflects that amount.[1]

On May 8, 2018, the undersigned held a hearing on the matter at which counsel for Plaintiff Linda Unruh and Defendants James D. Vandever Trucking, Inc. and Earl Roger Garrett were present. Also present were the court-appointed guardian ad litem ("GAL"), Donald Schutte; Plaintiff's former counsel, Michael Garrett ("Mr. Garrett"); and Mr. Garrett's own attorney, Stephen Hamilton. All current counsel as well as Mr. Garrett were given the opportunity to address the Court.

## **BACKGROUND**

This case stems from a February 19, 2017 accident in which Robert Unruh ("decedent") was hit and killed by a tractor trailer driven by Earl Roger Garrett, an employee of James D. Vandever Trucking, Inc. The decedent left behind three minor children, but no spouse. The main underlying factual and legal issues in the case are whether decedent was at fault for standing in the roadway, or whether Earl Roger Garrett[2] was negligent in his operation of the tractor trailer. Under New Mexico law, the decedent's three minor children are the sole beneficiaries of his

---

[1] The motion before Judge Vidmar was the parties *Third Joint Motion to Approve Minors' Settlements* [Doc. 73]. As explained herein, that motion has been superseded by the *Fourth Joint Motion to Approve Minors' Settlements* [Doc. 78], which the parties filed as a result of Judge Vidmar's finding that he could not recommend as reasonable a settlement agreement that included an attorney's fee for Mr. Garrett that was above 25%.

[2] At the hearing Mr. Garrett informed the Court that he is not related to Earl Roger Garrett.

wrongful death estate. N.M. Stat. Ann. § 41-2-3(C). They are represented in that capacity by their grandmother (and decedent's mother), Linda Unruh.

On June 1, 2017, Mr. Garrett and counsel for the Defendants filed a perfunctory motion to dismiss [Doc. 14] on the grounds that they had reached a settlement. On June 7, 2017, this case was assigned to the undersigned United States District Judge. The joint motion to dismiss caught the Court's attention because it was unusual in that it contained no request for appointment of a GAL or for a fairness hearing to protect the interests of the minors. The Court did not grant the motion to dismiss, but instead on June 8, 2017, the Court issued an order to show cause [Doc. 18] before June 22, 2017 why it should not appoint a GAL and conduct a fairness hearing to determine whether the settlement was in the best interest of the minors. Surprisingly, the Court received no response from either party. As a result, on June 26, 2017, the Court ordered the parties to file a joint motion to appoint guardian *ad litem* and a motion to approve the settlement by certain deadlines. [Doc. 20] The parties did not perform either task on time, nor did they move for an extension of time, causing the Court to issue a second order to show cause [Doc. 24][3] on August 22, 2017. At this point, the Court was concerned that this case was not proceeding upon a normal path.

### **FINDINGS OF FACT**

In his Proposed Findings and Recommended Disposition [Doc. 74], Judge Vidmar did an excellent job setting forth the procedural and factual history of this case. Therefore, rather than

---

[3] The Court notes that at the hearing, Mr. Garrett blamed his failure to respond to the first order to show cause during the period June 8-22, 2017 on the fact that he had an operation "that disabled the heck out of [him] for a time." Transcript of May 8, 2018 Hearing, Doc. 80 at 44. In his response to the second order to show cause [Doc. 25 at 1], Mr. Garrett stated that on June 26, 2017, he had been "out of town and on vacation."

3

repeating that discussion [Doc. 74 at 2-6] here, the Court incorporates and adopts it as though set forth herein. The Court makes the following additional findings of fact:

1. In his initial proposed settlement agreement, Mr. Garrett proposed that 25% of the net settlement proceeds, or $137,512.06, be distributed to Linda Unruh in her personal capacity, despite the fact that she had not asserted a legal claim against Defendants in this or any other lawsuit. Doc. 28 at 1. In doing so, he took a position that was directly adverse to those of his clients, the children, as represented by Linda Unruh in her capacity as representative of the wrongful death estate. Linda Unruh in her personal capacity was not Mr. Garrett's client, and any claim to a share of the insurance proceeds made by her in her personal capacity would reduce the recovery by his clients.[4] As Judge Vidmar put it, "any attorney representing the estate would have an ethical obligation to try to defeat Plaintiff's loss-of-consortium claim." Doc. 74 at 15

---

[4] Under New Mexico law, there can be no doubt that both Mr. Garrett and Linda Unruh had a duty to protect the interests of the decedent's three minor children to recover for their father's loss of life. As the personal representative in the wrongful death case, Linda Unruh has a nondiscretionary duty to distribute the wrongful death proceeds in the ratio prescribed by the Wrongful Death Act. *Leyba v. Whitley*, 120 N.M. 768, 776, 907 P.2d 172, 180 (1995). "Therefore, any agreement to pursue a wrongful death lawsuit will, by definition, be for the benefit of the statutory beneficiaries." *Spencer v. Barber*, 2013-NMSC-010, ¶ 22, 299 P.3d 388, 396 (2013). Similarly, Mr. Garrett's sole duty in this case was to the children. As the New Mexico Supreme Court explained in *Spencer*:

> [T]here can be no other purpose of an attorney-client agreement to pursue claims for wrongful death than to benefit those persons specifically designated by the Act as statutory beneficiaries. We conclude therefore that . . . the very nature of a wrongful death action is such that we will imply in law a term in every agreement between an attorney and personal representative that the agreement is formed with the intent to benefit the statutory beneficiaries of the action. It is unnecessary to analyze in each wrongful death case whether the attorney for the personal representative actually intended to benefit the statutory beneficiary. Under the rule laid out in *Leyba*, the statutory beneficiary is always the intended beneficiary of the agreement between the personal representative and her attorney.

*Spencer v. Barber*, 2013-NMSC-010, ¶ 22, 299 P.3d 388, 396 (quoting *Leyba*) (internal citations and quotations omitted).

n.13. But rather than trying to defeat Linda Unruh's claim, Mr. Garrett advocated for it in the original settlement agreement. This is a violation of Rule16-107 of the Rules of Professional Conduct, which states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Rule 16-107(A), N.M. Rules Ann. 1978.

2. It appears unlikely that Linda Unruh had a viable claim for loss of consortium of her son in any case.[5] In this case, when the GAL challenged the proposed $137,512.06 payment to Linda Unruh personally for her alleged loss of consortium with her son, *see* Doc. 29, Mr. Garrett defended the payment not with citation to any legal authority or any facts showing the required mutual dependence between mother and adult son, but rather with an emotional argument about "the load placed on Linda Unruh by having to be appointed as the permanent guardian and conservator for Robert Lee Unruh and Leland Merle Unruh." Doc. 31 at 4. In other words, he was unable to demonstrate any factual or legal basis for a payment to Linda Unruh individually, but nevertheless he was willing to distribute to her 25% of the money due to his clients under the Wrongful Death Act.

3. Mr. Garrett also initially advocated for payments to three other third parties—bystander Chad Becerra ($5,000) and the two towing companies ($2,500 each) with tow trucks at the scene of the accident—for a total of $10,000 deducted from the monies to be paid to his clients. Mr. Garrett did this, it appears, at the behest and insistence of Defendants' insurer and defense

---

[5] To recover damages under a loss-of-consortium theory under New Mexico law, the claimant must prove, among other things, that she and the injured party shared a sufficiently close relationship. *Wachocki v. Bernalillo County Sheriff's Dept.*, 150 N.M. 650, 651-52, 265 P.3d 701, 702-03 (N.M. 2011). Although there are several factors to consider in determining whether a relationship is sufficiently close, "mutual dependence is the key factor in determining whether the claimant shared a sufficiently close relationship with the injured party." *Id.*, 265 P.3d at 704 (holding that adult siblings did not exhibit the mutual dependence required for recovery, even though brothers were roommates and shared small amount of financial responsibilities).

counsel so that the insurer would settle with his clients for policy limits.[6] Transcript of May 8, 2018 hearing at 37 (Mr. Garrett: "I must tell you, that for this agreement to be concluded, Mr. Sedillo required that I acquire the releases from the two wrecking companies, from Chad, and also from Mrs. Unruh. Those were the requirements to get the million dollars."). In exchange, those third parties (who were not Mr. Garrett's clients, and whose claims to the $1 million policy limits were adverse to his own clients' claims) released their claims against Defendants. *See* Transcript of May 8, 2018, hearing at 35-36 (Mr. Garrett stated, "I want the Court to know that the reason the payment was made to Chad was that Chad was injured. Chad wasn't only injured physically, he was injured mentally. And he was so incapacitated after all of this that he finally was discharged from employment by Mrs. Unruh because he couldn't operate a tow truck anymore. I did not feel that I could go to him and ask him to give a release of his claims without paying him some money.").[7] Mr. Garrett does not seem to recognize, even at this point, that it is

---

[6] The Court must question the ethical soundness of this action by defense counsel as well. If the two towing companies had any claim at all, it would not be one for personal injury, but rather for property loss or damage. Thus, it would be payable from the property damage limits of the policy, rather than from the $1 million personal injury policy limits. Despite this, it appears defense counsel attempted to force payment of these property claims from the personal injury portion of the policy. Further, only defense counsel should have been negotiating with Becerra and the towing companies for a release of their claims against Defendants; it was improper to place Mr. Garrett in that position.

[7] Mr. Garrett asserts that Becerra was physically injured in the accident, although the Court has seen nothing in the record that would support that statement. Mr. Garrett does state that Becerra was so affected emotionally by the accident that he could no longer work as a tow truck driver, suggesting that he had a claim for negligent infliction of emotional distress. However, assuming that Becerra did have physical injuries, it seems highly unlikely to the Court that Becerra would have had a viable claim for emotional distress from witnessing the death of the decedent. Under the "direct victim theory," which has not been adopted in New Mexico, a plaintiff who suffers injury as a result of the defendant's negligence is allowed to recover for emotional distress suffered as a result of witnessing the death of another in the same accident. In *Montoya v. Pearson*, 140 N.M. 243, 245-46 (Ct. App. 2006), the New Mexico Court of Appeals rejected precisely that type of claim. Rather, the New Mexico Supreme Court has held that the right of recovery for negligent infliction of emotional distress is limited to "a bystander who [suffers]

not his place as counsel for the minor beneficiaries of the wrongful death estate to seek out parties with adverse claims, persuade them to release those claims, and then arrange for payment from the wrongful death estate as consideration for their release. Although this arrangement presents clear conflicts of interest, both Mr. Garrett and his counsel insist on characterizing it as a mere "cost" of litigation, akin to fees one would pay to an expert. *See* Transcript of May 8, 2018 hearing at 60 (Mr. Hamilton stated: "I would suggest the Court look at that as not—as something like a payment to facilitate a settlement. There's no problem with the—with Mr. Garrett paying $2,500 to an accident investigator in order for him to do his work. That's not considered taking it from the children. And I suggest that these payments are pretty much the same way. It's just what had to be done in order to get the settlement done."). However, one pays an expert for his or her work in reviewing in materials and preparing an opinion in an effort to advance the merits one's case—not as a type of payoff to clear the way for a settlement.

4. While the initial Joint Motion to Dismiss was filed on June 1, 2017, it appears that the settlement proceeds had been deposited in Mr. Garrett's trust account almost two weeks earlier, on May 17, 2017. Doc. 45-3 at 5 (billing statement from Garrett Law Firm to Linda Unruh). By June 8, 2017, when Mr. Garrett finally communicated with a structured settlement broker regarding the establishment of an annuity for the minors, he had had possession of the funds for several weeks. Doc. 29 at 15-16.[8] Mr. Garrett has not specified when, precisely, he intended to

---

severe emotional shock as a result of witnessing a sudden, traumatic event that causes serious injury or death to a family member." *Fernandez v. Walgreen Hastings Co.*, 126 N.M. 263, 266, 968 P.2d 774 (N.M. 1998). Thus, Mr. Garrett advocated for a claim by Becerra that was not only adverse to his client, but also had a questionable legal basis.

[8] Although Mr. Garrett showed a shocking disregard for the best interests of the children he was duty-bound to protect, frankly the Court is almost as appalled by the conduct of defense counsel in this case. They appear to have authorized the disbursement of $1,000,000 in policy limits not only before the Court dismissed the claims against their client, but also before a motion to

get around to obtaining court approval of the settlement or when he intended to set up an annuity—both tasks that typically are completed prior to distribution of funds.

5. Furthermore, it appears that by August 25, 2017, when the parties filed their first joint motion to approve the settlement, Mr. Garrett had already distributed the proceeds without first seeking court approval, either in this court or in the state court. See Doc. 29 at 7, 15-16. Yet, in the motion [Doc. 28] Mr. Garrett failed to mention that funds already had been distributed.

6. On June 8, 2017, the structured settlement broker informed Mr. Garrett that there could be no structured settlement constructed for the children because the settlement proceeds already had been placed in Mr. Garrett's trust account. *See* Email from Sara VanFleet to Michael Garrett, Doc. 29 at 15-16. Despite this knowledge, he made no moves to unwind the settlement until ordered to do so by this Court on October 20, 2017. [Doc. 34]

7. It has been nearly one year since this case settled. Properly handled, the settlement could have been approved and the money distributed to the children a long time ago. Mr. Garrett's inappropriate actions have caused considerable delay to the children's access to the funds they need. Mr. Garrett's actions have wasted judicial resources, as the Court has spent time and energy in order to ensure that the interests of the children are protected. Finally, because of

---

dismiss was even filed. If any person or entity to whom that money was distributed (several of whom are not parties in this lawsuit) had spent the money prior to the Court's order to return it to the court registry, it is not clear that Defendant could have recovered the funds. In addition, defense counsel released the funds without the benefit of a fairness hearing and court order approving the settlement, thereby leaving their client vulnerable to an attack on the settlement when the minors reach the age of majority. Finally, they allowed disbursement of the funds without the benefit of a structured settlement to protect the minors. In this Court's experience, defense attorneys typically insist upon structured settlements, which is the best and most common practice even with settlement amounts much smaller than the one in this case. Fortunately for defense counsel, the Court required a fairness hearing and ordered return of the funds before their client was harmed. Although the carelessness of defense counsel is not directly relevant to the question of whether the proposed settlement is fair and in the best interests of the minors, it bears noting here because it contributed to the situation this case is in today.

deficiencies in Mr. Garrett's representation of the children, Linda Unruh was forced to hire new counsel in order to straighten out the mess created by Mr. Garrett and defense counsel. This created an additional cost to the wrongful death estate, and therefore decreased the recovery by the decedent's children.[9]

## **DISCUSSION**

The magistrate judge conducted a thorough analysis in this case. The Court concurs with both his analysis and conclusions in the following sections: First, Mr. Garrett and the insurance company fairly and honestly negotiated the proposed settlement for $1 million in policy limits [Doc. 74 at 9], with the exceptions of the improper payments to Becerra and the two towing companies used as leverage against the minors' recovery. However, that issue has been resolved because those payments have been returned. Second, the Court is persuaded that serious questions of fact exist, which place the ultimate outcome of the litigation in doubt. *Id*. at 10. Third, the value of an immediate recovery does outweigh the possibility of future relief. *Id*. at 11. Fourth, the Court agrees that with the exception of Mr. Garrett's fees (which as proposed now stand at 25%), the proposed settlement is fair and reasonable in its effect. This includes revising Mr. Garrett's original settlement proposal so that it no longer includes improper disbursements to individuals other than the decedent's minor children, reimbursing certain costs to Mr. Garrett[10], reimbursing litigation costs to Linda Unruh, and Mr. Grayson's fees. *Id*. at 11-13. The Court also agrees with the magistrate judge's discussion regarding the structured settlements. *Id*. at 17-18. However, with regard to Mr. Garrett's fees, *see* Doc. 74 at 13-17, the Court agrees with much of

---

[9] As Judge Vidmar noted, Mr. Grayson's fees in this case are eminently reasonable. Doc. 74 at 13. The Court thanks him for his service on behalf of the children in this matter.
[10] This includes the $30,000 workers' compensation claim, which Mr. Garrett negotiated down from $250,000.

the magistrate judge's analysis but not with his ultimate conclusion that a 25% fee for Mr. Garrett would be appropriate.

As an initial matter, the Court is satisfied that it has the authority to review the reasonableness of Mr. Garrett's fee. That authority stems from New Mexico common law, which states that "[a] trial court in an action involving minor children has a special obligation to see that they are properly represented, not only by their own representatives, but also by the court itself." *Garcia v. Middle Rio Grande Conservancy Dist.*, 99 N.M. 802, 808, 664 P.2d 1000, 1006 (N.M. 1983), *overruled on other grounds by Montoya v. AKAL Sec.*, 114 N.M. 354, 357, 838 P.2d 971, 974 (N.M. 1992) (citations omitted). "In passing upon settlements dealing with claims or rights of minors, the court must determine whether the approval of a compromise would be in the best interests and welfare of the minor child." *Garcia*, 99 N.M. at 808, 664 P.2d at 1006 (citing *United States v. Reilly*, 385 F.2d 225 (10th Cir. 1967)). A court is required to reject a settlement "[w]hen a settlement involving a minor is presented to a court for approval and the information before the court indicates that the settlement is not fair to the minor." *Shelton v. Sloan*, 127 N.M. 92, 100, 977 P.2d 1012, 1020 (Ct. App. 1999). Also relevant here is Rule 16–105(A), N.M. Rules Ann. (1978), which states: "A lawyer shall not make an agreement for, charge or collect an unreasonable fee."

Furthermore, the United States Court of Appeals for the Tenth Circuit has concluded that it is proper for a federal district court sitting in diversity to not only review, but also reduce, an attorney's contractual contingent fee with regard to his representation of a minor in a personal injury case. *Garrick v. Weaver*, 888 F.2d 687, 690-91 (10th Cir. 1989). In *Garrick*, the district court determined that the plaintiff's attorney had violated New Mexico ethics rules, and therefore it declined to enforce the contingent fee agreement, opting instead to award fees based on the

reasonable value of the attorney's legal services. *Id*. at 691. The Tenth Circuit upheld the district court, noting that under New Mexico law, when a client discharges an attorney for cause (which in *Garrick* also included a violation of an ethical rule), the federal district court may refuse to enforce the contingent fee agreement and award damages on a *quantum meruit* basis instead. *Id*. at 691. Thus, the Court will proceed in this manner.

In determining the reasonable value of Mr. Garrett's legal services here, the Court notes that Mr. Garrett and Ms. Unruh entered into a contractual contingency fee of 33.3%.[11] Doc. 45-1 at 1. Further, the Court is mindful of the fact that he aggressively and competently investigated and pursued this case in the days and weeks following the accident. Despite the fact that the police report assigned blame to the decedent, after Mr. Garrett's investigation persuaded the insurer to tender the full policy limits just ten weeks after the date of the accident. Further, Mr. Garrett filed a workers' compensation claim on behalf of his clients, resolved the workers' compensation subrogation claim very favorably for the minors, and took no fees for doing so. According to Mr. Garrett's affidavit, he spent 186.6 hours working on this case.

However, when one represents minors in a wrongful death case, one must be mindful of representing their interests alone, even to the exclusion of the interests of others who may have competing claims. Further, a personal injury lawyer's task does not end once he has negotiated a settlement with the tortfeasor—in fact, often that is only half the job. In a wrongful death case involving minor plaintiffs, there is nearly as much work to be done after a settlement is reached as there is beforehand. Working with the GAL, obtaining judicial approval of the settlement, setting up an annuity or structured settlement, and making sure other benefits (e.g., Social

---

[11] The Court routinely enforces similar contractual contingency fees. That the Court has determined that it should reduce this fee is a testament to the extraordinary circumstances presented in this case.

Security, workers' compensation) are properly disbursed to the minors and protected for their benefit are equally important and time-consuming activities. It does the minors little good for their lawyer to obtain a settlement for policy limits if their recovery is not properly distributed, protected, and invested for their benefit. In this part of the representation, Mr. Garrett utterly failed. As previously discussed, he did not protect the interests of the children to the exclusion of all others, he failed to seek court review of the settlement, and he did not properly pursue a structured settlement to preserve the children's interests in the money. Instead, he had the settlement proceeds distributed to himself and took his cut before he even began to seek out a structured settlement, an approach that is utterly backward and necessitated a return of all proceeds to the Court registry. Ultimately, his clients fired him and were forced to hire another attorney to right the ship and make sure they received their fair share of the settlement proceeds. This, in turn, imposed additional costs to the wrongful death estate and caused a significant one-year delay in the minors receiving the benefit of the settlement. As a result, to award Mr. Garrett the proposed 25% fee, or $250,000.00, would simply be unconscionable.

In view of the foregoing, the most that the Court can say is that Mr. Garrett did half his job. As such, he should be entitled to receive a maximum of approximately half the fee set forth in the contingency agreement, or 16.5% of the recovery, for a total of $165,000.00. The Court concludes that this is the reasonable value of Mr. Garrett's legal services in steering the case to a relatively quick settlement for policy limits. And, although this was a contingency fee case, the lodestar method can still provide a metric for evaluating the nature and reasonableness of the fee award. It is worth noting that a fee of $165,000.00 for 186.6 hours results in an hourly rate of $884.24 for Mr. Garrett, which is significantly far above any hourly fee that the undersigned judge has ever approved in any attorney's fee application put before her. Finally, the Court

concludes that this amount is generous in light of the serious ethical breaches committed by Mr. Garrett in this case.

Based on the foregoing,

**IT IS HEREBY ORDERED** that the parties' *Fourth Joint Motion to Approve Minors' Settlements* [Doc. 78] is **DENIED** because the amount of attorney's fees awarded to Mr. Garrett is unacceptable in light of the facts of this case.

**IT IS FURTHER ORDERED** that the parties second and third motions to approve the settlement [Docs. 69 and 73] are **DENIED AS MOOT**.

_____
**UNITED STATES DISTRICT JUDGE**